**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Regina M. Rodriguez**

Civil Action No. 1:19-cv-03275-RMR-STV

ATHENA BOTANICALS, LLC,
a Colorado Limited Liability Company, et al.,

      Plaintiffs / Counterclaim Defendants,

v.

GREEN EARTH TECHNOLOGIES, L.L.C.,
an Arizona Limited Liability Company, et al.,

      Defendants,

and

GREEN EARTH TECHNOLOGIES, L.L.C.,
an Arizona Limited Liability Company, et al.,

      Counterclaim and Third-Party Plaintiffs,

v.

JEREMIAH COMBS, et al.,

      Third-Party Defendants

---

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

---

This case revolves around the parties' failed business venture involving a 2019 hemp harvest and related oil-processing operations.  After relations between the parties broke down, Plaintiffs/Counterclaim Defendants Athena Botanicals, LLC ("Athena") and San Juan Hemp Company, LLC ("SJHC") (collectively, "Athena Parties" or "Plaintiffs")

filed suit against Defendants/Counterclaim Plaintiffs HALO Laboratories, LLC ("HALO") and Defendants Green Earth Technologies, L.L.C. ("Green Earth") and David Vindici ("Vindici") (collectively, "HALO Parties" or "Defendants") for negligent misrepresentation, fraudulent concealment, and declaratory judgment.

In response, HALO[1] asserted counterclaims and third-party claims for fraud and negligent misrepresentation against the Athena Parties and Third-Party Defendants Jerrod Young ("Young"), Crystal Combs Young ("Crystal"), Jeremiah Combs ("Jeremiah"), and CBD Extracts Inc. ("CBD Extracts").  HALO also asserted counterclaims and third-party claims for unjust enrichment against the Athena Parties, Young, Crystal, Jeremiah, Young Construction Services ("YCS"), and Honeycombs Herbs & Vitamins ("Honeycombs").  HALO also asserted a claim of promissory estoppel against the Athena Parties and CBD Extracts.  The Court has jurisdiction pursuant to 28 U.S.C. § 1332.

This Court presided over a three-day bench trial on May 23-25, 2023.  Having carefully considered the evidence presented at trial, the applicable law, and all matters of record, and being fully advised in the premises, the Court issues the following Findings of Fact and Conclusions of Law pursuant to Fed. R. Civ. P. 52(a).

## I.      FINDINGS OF FACT

The Court makes the following findings of fact pursuant to Fed. R. Civ. P. 52(a)(1).[2]

---

[1] On May 25, 2023, Green Earth dismissed its claims by stipulation of the parties pursuant to Fed. R. Civ. P. 41. *See* ECF No. 194.

[2] Where specific testimony or evidence is cited, the Court finds that evidence was credible and probative as to the Court's findings. This Order does not attempt to address all of the voluminous evidence presented at trial; neither all of evidence supporting the Court's findings is cited herein, nor does the Court attempt to explain or distinguish every piece of contrary evidence. In making the following findings, the Court has carefully considered and weighed all of the available evidence, and the Court's findings also reflect its evaluation of the witnesses' credibility.

**A.     The Parties**

<u>Plaintiffs/Counterclaim Defendants: Athena and SJHC</u>

1.      Athena is a Colorado limited liability company formed on or about July 30, 2018.  ECF No. 184 at 30, ¶ 8 (Parties' Stipulated Facts).

2.      SJHC is a Colorado limited liability company formed on or about September 19, 2018.  *Id.* ¶ 9.

<u>Defendant/Counterclaim Plaintiff/Third-Party Plaintiff: HALO</u>

3.      HALO is a Wyoming limited company formed in 2019 with a principal place of business in Arizona.  *Id.* ¶ 1.

<u>Defendants: Vindici and Green Earth</u>

4.      Defendant Green Earth is an Arizona limited liability company with a principal place of business in Arizona.  *Id.* ¶ 2.

5.      Defendant Vindici is and was, at all relevant times, a resident of Arizona. *Id.* ¶ 5.

6.      HALO is owned 100% by Green Earth.  *Id.* ¶ 3.

7.      Green Earth is owned 100% by Vindici.  *Id.* ¶ 4.

<u>Third-Party Defendants: Young, Crystal, Jeremiah, CBD Extracts, YCS, Honeycombs</u>

8.      Young and Crystal are longtime romantic partners and residents of Montrose, Colorado.  *Id.* ¶ 6.

9.      CBD Extracts is a Colorado corporation formed on or about July 30, 2018. *Id.* ¶ 7.

10.     CBD Extracts is wholly owned by Young.  *Id.*

11.     Young formed CBD Extracts to perform CBD extraction services, but it was supplanted by Athena during 2019 (the period at issue in this lawsuit).  Tr. 36:5-25.

12.     Jeremiah is Crystal's brother and a resident of Montrose, Colorado.

13.     YCS f/k/a Young Custom Builders, LLC, is a Colorado limited liability company with its principal place of business in Montrose, Colorado.

14.     Young is the owner of YCS.

15.     Honeycombs is a Colorado limited liability company with its principal place of business in Montrose, Colorado.

16.     Crystal is the current owner of Honeycombs.

**B.     Defendants' Businesses**

17.     In 2013, Vindici became involved in the hemp industry while looking to alleviate the seizures affecting this then 3-year-old son.  Tr. 514:4-13.

18.     In 2016, Vindici began working on a Vertical Integration Plan for his business.  As part of the plan, HALO entered the business of selling cannabidiol ("CBD"), cannibigerol ("CBG"), and cannabinol ("CBN") products to other businesses, including isolate, oil-based products such as 0% THC oil and distillate, as well as certain finished CBD-based goods, such as gummies, tinctures, gel caps, lotions, and more.  Ex. 9,[3] Tr. 516:23; 517:17.

19.     On December 20, 2018, Congress passed the 2018 Farm Bill.  The 2018 Fam Bill removed CBD from the list of Schedule 1 narcotics, which meant CBD, CBG,

---

[3] All references to "Ex." Herein refer to admitted trial exhibits, unless otherwise noted.

and CBN were no longer illegal at the federal level.  This broadened the market for these products.

20.     Effective January 22, 2019, HALO entered into a Supply Agreement with PalliaTech n/k/a Curaleaf Holdings, Inc. ("Curaleaf"), pursuant to which HALO agreed to supply Curaleaf with certain products.  Ex. 258.

21.     Curaleaf is an American cannabis company listed on the Canadian stock exchange and is the largest national retail dispensary brand in the United States. Curaleaf was HALO's largest customer in 2018 and during the relevant period.  Tr. 520:14-18.

**C.     Plaintiffs' Businesses**

22.     In early 2019, SJHC embarked on its first hemp harvest.  Tr. 38:16-24.

23.     Prior to meeting Vindici, SJHC planned on growing a five-acre hemp harvest for that year's growing season.  Tr. 135:16-20.

24.     At the time, Athena had recently begun processing hemp into oils, distillates, and isolates.  Tr. 49:19-50:6.

**D.     Vindici Contacts Young**

25.     In 2018, HALO was looking to fulfill its obligations to Curaleaf and implement its Vertical Integration Plan.  Tr. 525:24-526:19.

26.     To that end, Vindici began looking for suppliers who could grow and process hemp that HALO could resell to Curaleaf.  *Id.*

27.     On January 31, 2019, Vindici (using an account named "Phyto Plant") reached out to Young via LinkedIn inquiring as to the availability of 0% THC oil or distillate. ECF No. 184 at 30, ¶ 10 (Parties' Stipulated Facts); Ex. 3.

28.     Young responded to the LinkedIn message, stating that he could provide 0% THC oil or distillate.  Ex. 3.

29.     On February 1, 2019, HALO agreed to purchase a test kilo of 0% THC distillate from CBD Extracts for $7,300.  Ex. 6; Ex. 23.

30.     By email, Young directed HALO to pay for the test kilo either by paying CBD Extracts via PayPal or by paying Athena by wire to its account at Alpine Bank.  Ex. 6; Ex. 23.

31.     On February 4, 2019, HALO wired $7,300 to Athena for the test kilo.  *See* Ex. 15-5; Ex. 23.

32.     On February 20, 2019, Vindici shared the third-party lab results for the test kilogram with Young by email in the form of a hyperlink to a "COA" or Certificate of Analysis." Ex. 23 at 2.

**E.     Initial Meeting of the Parties in Colorado**

33.     On or about February 19, 2019, Vindici travelled from Arizona to Colorado to meet with Young, Crystal, and Jeremiah, individually and on behalf of Athena, SJHC, and CBD Extracts, in Montrose, Colorado.  Tr. 535:11-536:2.

34.     On or about February 20 and 21, 2019, Vindici met with Young, Crystal, Jeremiah, and others, at the Athena lab and SJHC farm in Montrose, Colorado.  Ex. 5; Ex. 6; Ex. 23; Tr. 69:4-6, 72:7-18; Tr. 538:13-539:5.

35.     Vindici told Young and Crystal that he was "looking for labs to produce and fulfill his orders [] for his customers and that . . . he had other laboratories but couldn't keep up with his demand.  Tr. 68:11-23.  Vindici explained "he was looking into partnering

up with small guys like [Athena] to produce products for him and his corporations.  Tr. 67:7-11.

36.    At the time, Vindici knew that Young was "new to the industry."  Tr. 562:11-14.

37.     At the initial meeting, Young told Vindici that Athena operated a CBD processing facility (commonly called a "lab") and that SJHC was entering its first growing season.

38.     During this meeting, the parties discussed a collaboration that would enable HALO to implement its Vertical Integration Plan by fulfilling the seed to refinement aspect of the plan.  Tr. 541:25-542:4.

39.    The purpose of the vertical integration was to reduce overall costs to HALO, streamline the process, and ensure that HALO had a reliable source of products to fulfill the Curaleaf contract and other customer orders.  Tr. 525:24-526:19.  Vindici believed that, through agreements with and interest in Athena and SJHC, HALO would be able to acquire higher quality isolate and oil at a lower price.  Ex. 6; Ex. 11; Tr. 524:5-19.

40.    HALO was willing to invest in Athena and SJHC, including by purchasing equipment, in exchange for an ownership interest in those entities.  Tr. 178:11-14, 179-3:6.

41.    During the initial meeting, the parties discussed the HALO Parties' investment in a joint venture that would include the cultivation of hemp as well as the extraction, distillation, isolation, and purification of hemp oils.  Tr. 177:23-179:9.

42.     Vindici represented he had more than 12 years of experience in the hemp industry.  Ex. 1-4; Ex. 10.

43.     During the initial meeting, Vindici and Young also discussed new equipment for Athena's lab to increase its processing capabilities.

44.     After several discussions with Vindici, SJHC decided to undertake a 30-acre harvest, rather than the 5-acre harvest they had initially planned for.  Tr. 139:6-14. This included 19.8 acres leased from a neighboring farm.  Tr. 138:20-24.

**F.     The Parties Move Forward**

45.     Ultimately, the parties moved forward, with the HALO Parties providing certain financial backing through the purchase of equipment and processing work.  Tr. 582:12-583:21.

46.     On February 21, 2019, Vindici provided Young with a Mutual Confidentiality Agreement by and between HALO and CBD Extracts.  Ex. 6; Ex. 23; Ex. 252.  The parties did not sign that agreement.  Ex. 252.

47.     In late February 2019, Vindici caused a HALO corporate mailbox to be set up with UPS in Montrose, Colorado so that HALO could receive oil to be processed in Athena's lab and ship oil that had been processed.  Ex. 26; 552:11-23.

48.     On February 26, 2019, Vindici told Young that he would order a Gilson extraction machine to the Athena facility in Montrose, Colorado.  Ex. 25.  The Gilson machine was expected to increase Athena's processing capabilities.

49.     After receiving test results from the initial kilogram in late February 2019, HALO began paying Athena to process oils to fulfill its contract with Curaleaf.  Tr. 557:1-25.

50.     HALO placed its first large order, 28 kg for $190,400 (or $6,800 per kilogram), on or about February 21, 2019.  Ex. 93-3.

51.     HALO continued to purchase distillate and isolate from Athena until in or about July 2019, when the parties' relationship broke down.

52.      In addition to purchasing distillate and isolate from Athena, HALO also purchased processing and extraction services from Athena, from April 2019 until and including July 2019.  Ex. 93-4.

53.      On or about March 1, 2019, Vindici provided a Toll Manufacturing and Supply Agreement by and between Athena d/b/a CBDE and HALO (the "Supply Agreement"). Ex. 253.  The Supply Agreement provided Athena and CBD Extracts would manufacture, package, and supply product in accordance with HALO's standards.   In exchange for 35% ownership in Athena, HALO was to pay 35% of the capital investments or equipment leasing required for new unit operations related to improving product quality as well as certain processing costs.  Ex. 253.003.

54.     The parties did not sign the Supply Agreement, but the parties continued to work together.  Tr. 556:8-14.

55.     In March 2019, HALO ordered and paid for a Gilson machine to be delivered to Athena's facility in Montrose.  Ex. 19.

56.     On or about March 11, 2019, Vindici modified HALO's Vertical Integration Plan to reflect HALO's relationship with Athena and SJHC.  Ex. 9.

57.     On or about March 12, 2019, CBD Extracts issued Invoice No. 210 to Athena for $50,000.00 for payment towards a 28 kilo 0% THC order.  Ex. 146.  HALO paid Athena $50,000.00 the following day.  Ex. 230.

58.     On or about March 21, 2019, CBD Extracts issued Invoice No. 212 to Athena for $105,000.00 for 20 kilos of CBD isolate.  Ex. 14-5.  The same day, HALO paid Athena $169,000.00.  Ex. 230.

59.     On or about April 15, 2019, Vindici emailed Young a proposed Letter of Intent ("LOI") pursuant to which, in exchange for its investment, HALO would receive a 30% membership interest in Athena and Green Earth or its assign would receive a 45% membership interest in SJHC.  Ex. 11; Ex. 35; Ex. 233.

60.     The following day, Young responded to the LOI proposal with his thoughts and additions.  Ex. 31.

61.     The LOI was never signed by the parties.  Ex. 11; Tr. 90:16-17.

62.     Nevertheless, the parties continued working together.

63.     On or about May 7, 2019, the Gilson machine Vindici ordered arrived at Athena's facility in Montrose, Colorado.  Tr. 124:13-17; Ex. 33-2.

64.     Onsite training was provided by Gilson for the lab workers, including Jeremiah.  However, while the Gilson representatives could get the machine running properly, even with additional training, the Athena lab workers could not.  Tr. 124:3-6.

65.    Ultimately, Athena could not get the Gilson machine to work, and Vindici demanded and received a full refund from Gilson. Tr. 667:13-17; Ex. 39, 44.

66.    Between February and June 2019, Vindici attempted to get the agreement between the parties in writing, but the parties never executed any written agreements. Ex. 35; Ex. 50-1; Ex. 51-4; Ex. 52-4; Ex. 55-19; Ex. 56-12. Ex. 233.

**G.    The 2019 Hemp Harvest**

67.    Although SJHC had initially planned on growing a five-acre hemp harvest for that year's season, it ultimately undertook a 30-acre harvest.  Tr. 135:16-20; 139:6-14.

68.    Young testified that SJHC conducted no business that year other than the 30-acre hemp crop at issue in this case.  Tr. 139:9-11.

69.    In June 2019, the parties identified an issue with weeds encroaching on the hemp harvest.  Ex. 65-1; 148:15-19.

70.    As a result, HALO paid $20,000 toward weeding labor.  Tr. 150:4-9.

71.    In an attempt to save the harvest, SJHC paid laborers to perform additional weeding totaling $20,936.20.

72.    Despite the parties' efforts, Young testified that the 30-acre hemp cultivation was a total loss.  Tr. 235:23-236:6.

73.    However, SJHC's 2019 Profit and Loss shows SJHC realized $161,942.19 in income from "Crop Sales" in 2019.

74.    Ultimately, only 440 pounds of hemp was harvested from SJHC in 2019 and processed by Athena.  Tr. 149:16-18; Ex. 205-33.

75.     Because Athena had not processed enough oil for HALO to fulfill the terms of its contract with Curaleaf, HALO purchased oil from third parties.  Ex. 272, Ex. 273.

**H.     July 2019 HALO Oil Shipment and Athena Processing**

76.     On or about July 17, 2019, HALO shipped 88 kilos of oil it had purchased from a third party to Montrose for processing by Athena.  Ex. 273; Ex. 49.

77.     On July 25, 2019, Vindici emailed Young and Crystal advising that there were 88 kilos of oil ready for pickup at the UPS store and asked that "[i]n preparation for processing please pickup the oil and run a quick lab test in accordance with each tag." Ex. 51-2.

78.     Crystal advised that they had picked up the oil two days earlier and had begun processing it.  Ex. 51-1; Ex. 55-15; Ex. 56-8.

79.     The Athena Parties began processing the oil without first telling Vindici that the oil had been transported to Athena and without testing it upon arrival.  Tr. 208:5-7.

80.     Vindici advised Crystal to stop processing because he was "currently not in agreement regarding the tolling or price to process the order."  Ex. 55-15; Ex. 56-8.

81.     Crystal responded to Vindici that she "told them to stop all processing but they are already through 54kilos just an FYI."  Ex. 56-7.

82.     Crystal also represented to Vindici that testing had already been done, stating: "I know Brenden did the testing on all of the buckets that came in because new policy is that we test absolutely everything that comes through our doors and leaves."  Ex. 55-14; *accord* Ex. 56-7.

83.     Despite this representation, Crystal texted Young a minute later stating: "[Brenden] is going to back date the tests to two dates ago so we can tell David that we test everything when it comes into the building or leaves the building."  Ex. 205.022.

84.     When Crystal first produced the text messages, Crystal had intentionally deleted the part about back dating the tests.  Ex. 202.022.

85.     On July 26, 2019, Crystal provided the backdated tests to Vindici via email, stating the test showed "the CofA they did in the product when it first came in."  Ex. 55-5; Ex. 56-6.

86.     On July 29, 2019, four days after Vindici asked for processing to be stopped, Young texted Jeremiah asking: "How many total kilos do we have processed for David right now?"  Ex. 218.013.

89.     Jeremiah responded "I think we have gone threw [sic] 4 buckets…."  Ex. 218.013. Four buckets would have equaled 32 kilos.

90.     Young then instructed Jeremiah to "step up the processing to 12 kilos per day." He stated "[i]f David shows up this week and we don't [sic] truly have 54 kilos processed it's going to be a problem. Not to mention we all need the money."  Ex. 218.12.

91.     Two days later, Young instructed Jeremiah "Let's stop processing David's stuff. Let's just pour the other two kilos back. I already told David we processed 54 kilo…so were [sic] already over the amount."  Ex. 218.012.

**I.      The Parties' Relationship Ends**

92.     On July 30, 2019, Crystal e-mailed Vindici acknowledging that the parties' business relationship would not continue.  Ex. 55-3; Ex. 56-4.

93.     On July 27, 2019, Vindici proposed a "True Up" resolution to the parties' impasse pursuant to which Athena would process the 118 kilos of HALO's oil in its possession into 0% THC oil and provide test results by August 1, 2019, along with an additional 60 kilos of 0% THC oil and 2 kilos of ENZO by November 1, 2019.  Ex. 75-2.

94.     Crystal rejected the proposal on behalf of the Athena Parties.  Ex. 55-3.

95.     On July 31, 2019, Vindici sent an invoice to Athena for $177,600.00 for the value of HALO's product in its possession, including the 88 kilos of oil that Athena had picked up days before.

96.     Athena did not pay for the 88 kilos of oil or return the product.  Tr. 205:14-16.

**J.     Alter Egos - Young, Crystal, Athena, SJHC, CBD Extracts, Honeycombs, and YCS**

97.     Athena regularly received monies on behalf of CBD Extracts and SJHC, including from HALO.  Ex. 6; Ex. 13; Ex. 14; Ex. 23.

98.     Young treated the money in the accounts of YCS and Athena as his personal money.  Tr. 196:5-9.

99.     Young regularly transferred funds as needed between YCS and Athena.  Tr. 195:12-14; Ex. 15-6; Ex. 15-9; Ex. 15-15; Ex. 15-16; Ex. 15-18; Ex. 229.055.

100.    Young and Crystal paid personal expenses from Athena's and SJHC's bank accounts.  *See, e.g.*, Ex. 15.

101.    Honeycombs used Athena's products and equipment without paying Athena.  Ex. 15; Ex. 16.

102.    Money was transferred between Athena and SJHC.  *See, e.g.*, Ex. 228; Ex. 15; Ex. 228; Ex. 229.

103.    The principal place of business for each of YCS, Athena, SJHC, CBD Extracts, and Honeycombs is the same.  Tr. 155:15-156:17.

104.    At all relevant times, Athena, SJHC, CBD Extracts, Honeycombs, and YCS were majority or wholly owned and completely controlled by Young and Crystal.

105.    No adequate corporate records have been maintained for Athena, SJHC, CBD Extracts, Honeycombs, or YCS, and legal formalities have been disregarded.

## II.    CONCLUSIONS OF LAW

The Parties have asserted claims of negligent misrepresentation, fraudulent concealment, fraud, promissory estoppel, unjust enrichment, and declaratory judgment against one another as a result of this failed business venture. While few of these claims are sufficiently supported by the evidence, most are predicated on the residual effects of a risky business meeting its end.  Although each side complains of misrepresentations about the other regarding its experience levels in the industry, one must consider this in light of the fact that everyone agrees this was a nascent industry in 2019 when the venture began.  There were representations about the levels of experience on both sides that were either false or exaggerated, but easily could have been verified if the effort had been made.  However, even when misrepresentations may have been made, any reliance on such representations was not reasonable or justified in this Court's view.  The parties assumed the risk by relying on optimistic or exaggerated representations without

sufficient due diligence in deciding whether to invest money in a venture with no agreement – written, formalized, or otherwise – in place.

### A.    Plaintiffs' Claims

#### 1.  Negligent Misrepresentation

"To state a claim for negligent misrepresentation under Colorado law, a plaintiff must allege: (1) the defendant, in the course of his or her business, profession or employment; (2) made a misrepresentation of material fact, without exercising reasonable care; (3) for the guidance of others in a business transaction; (4) with knowledge that the plaintiff would rely on his or her representation; and (5) the plaintiff justifiably relied on the misrepresentation to his or her detriment." *Templeton v. Catlin Spec. Ins. Co.*, 612 F. App'x 940, 953 (10th Cir. 2015) (citing *Allen v. Steele*, 252 P.3d 476, 482 (Colo. 2011)). "A claim for negligent misrepresentation applies only if there has been a misrepresentation of an existing fact.  Such claim cannot be based solely on the nonperformance of a promise to do something at a future time." *Branscum v. American Community Mut. Ins. Co.*, 984 P.2d 675, 680 (Colo. App. 1999); *see also, e.g.*, *Mehaffy, Rider, Windholz & Wilson v. Central Bank Denver, N.A.*, 892 P.2d 230, 237 (Colo. 1995) ("In a claim for negligent misrepresentation, the misrepresentation must be of a material fact that presently exists or has existed in the past.  A promise relating to future events without a present intent not to fulfill the promise is not actionable.  Expressions of opinion cannot support a misrepresentation claim.") (internal citations omitted).

Further, "'puffery' is an important legal concept" that is "used to characterize those vague generalities that no reasonable person would rely on as assertions of particular

facts."  *Renfro v. Champion Petfoods USA, Inc.*, 475 F. Supp. 3d 1242, 1247 (D. Colo. 2020) (quoting *Alpine Bank v. Hubbell*, 555 F.3d 1097, 1106–07 (10th Cir. 2009)) (applying Colorado law).  "Such statements can't be the basis for any claim that takes as one of its elements a misrepresentation of fact."  *Id.*  "This is because statements constituting puffery fall into the category of 'kinds of talk which no sensible man takes seriously, and if he does he suffers from his credulity."  *Id.* (quoting *Alpine Bank*, 555 F.3d at 1107).  "[N]either party usually believes what the seller says about his own opinions, and each knows it."  *Id.*

In addition, a showing of damages is a necessary element of a claim for negligent misrepresentation.  *Templeton*, 612 F. App'x at 953 (noting that Colorado law requires that "the plaintiff justifiably relied on the misrepresentation **to his or her detriment**") (emphasis added); *Mehaffy, Ricer, Windholz & Wilson*, 892 P.2d at 236 ("The tort of negligent misrepresentation provides a remedy **when money is lost** due to misrepresentation in a business transaction.") (emphasis added); *Western Cities Broadcasting, Inc. v. Schueller*, 849 P.2d 44, 49 (Colo. 1993) ("In Colorado, we recognize the tort of negligent misrepresentation as providing a remedy in cases **involving money losses** due to misrepresentation in a business transaction.") (emphasis added); *see also* Colorado Civil Jury Instructions 9:4 (4th ed. May 2023) (requiring the element that the plaintiff's "reliance on the information supplied by the defendant caused damage to the plaintiff").

The Court will addresses three aspects of Plaintiffs' negligent misrepresentation claims separately: (1) the HALO Parties' alleged promise to invest in the processing and

farming operations at Athena and SJHC; (2) the HALO Parties' alleged misrepresentations that Athena relied on in agreeing to have the Gilson machine installed at Athena; and (3) the HALO Parties' alleged misrepresentations that SJHC relied on in agreeing to expand its 2019 crop from a 5-acre grow to a 30-acre grow.

### a. Plaintiffs' Negligent Misrepresentation Claim Regarding Investment in Athena and SJHC

First, the Court finds that Plaintiffs' claims regarding Vindici's and/or the HALO Parties' "promise to invest over $600,000 in the processing and farming operations" of Athena and SJHC to be unactionable because it is based solely on the non-performance of a promise to do something at a future time. Expressions of opinion cannot support a negligent misrepresentation claim.

To the extent Plaintiffs argue that Vindici or the HALO Parties made a promise to invest with "a present intent not to fulfill the promise," *see Mehaffy, Rider, Windholz & Wilson*, 892 P.2d at 237, this is contradicted by the fact that Vindici and/or the HALO Parties did, in fact, advance money, time, and resources toward what Plaintiffs describe as a "failed, inchoate joint venture" with them, *see* ECF No. 186 at 2. Moreover, the evidence tends to show that, upon making any representations about investing in Athena or SJHC, Vindici and/or the HALO Parties did not have a "present intent" to invest unconditionally in those companies. Rather, evidence shows that the intent that Vindici clearly communicated to Plaintiffs was that he would invest in exchange for a partial ownership in the companies. *See* Tr. 178:11–14, 542:5–16; *see also* Ex. Nos. 6, 11, 31, 35. Eventually, it became clear that the Athena Parties were not interested in giving up an ownership percentage in those companies, and the parties' relationship fell apart. *See*

Ex. Nos. 7, 31, 55, 95.   This does not render Vindici's and/or the HALO Parties' representations that he or they would invest, on the condition of receiving an ownership interest, false when made.  Plaintiffs' negligent misrepresentation claim on this basis fails.

> **b.** **Athena's Negligent Misrepresentation Claim Regarding the Gilson Machine**

Plaintiffs' next claim is that Athena suffered damages totaling $43,123.07 in expenses related to parts and vendors associated with the Gilson extraction machine that was purchased and installed at Athena at the HALO Parties' urging.  ECF No. 199 at 19, 26–27, 47.  For the following reasons, the Court finds that the claim fails on this basis, as well.

First, as stated above, a necessary element to establish negligent misrepresentation is that the alleged reliance on the misrepresentation caused damages. *See Templeton*, 612 F. App'x at 953; *Mehaffy, Ricer, Windholz & Wilson*, 892 P.2d at 236; *Western Cities Broadcasting*, 849 P.2d at 49; *see also* Colorado Civil Jury Instructions 9:4 (4th ed. May 2023).  Here, it is unclear whether the losses were a result of misrepresentations or user error, and as such, Plaintiffs have not met their burden. *See* Tr. 666:1–2, 682:25–4; *see also* Ex. Nos. 8, 39; *see also* ECF No. 201 at 19. In addition, the alleged statements of Vindici that Plaintiffs rely on for their negligent misrepresentation claim fall under a promise relating to future events or expressions of opinion.  Neither of which is sufficient to sustain the claim. Nevertheless, the Court also finds that Plaintiffs have failed to carry the burden on other key elements of the claim: that Defendants "made a misrepresentation of material fact" upon which Plaintiffs "justifiably relied."  *See Templeton*, 612 F. App'x at 953.

Plaintiffs claim that Vindici represented that a Gilson machine "'would increase [Athena's] production' to between 3–5 kilos a day."  ECF No. 199 at 18–19 (citing Tr. 123:8–20 (Young testimony); *id.* 291:14–19 (Jeremiah testimony)).  However, again, "[a] promise relating to future events without a present intent not to fulfill the promise is not actionable," and "[e]xpressions of opinion cannot support a misrepresentation claim." *Mehaffy, Rider, Windholz & Wilson*, 892 P.2d at 237; *Branscum*, 984 P.2d at 680.  To the extent Plaintiffs claim that Vindici lacked a present intent to fulfill his promise/prediction that the Gilson machine would increase productivity, the Court finds that position lacks credibility.  The Court finds that Vindici credibly testified that he "absolutely" wanted it to work.  Tr. 594:13–14.  Indeed, at that point in the relationship, it appears that both parties were still hopeful that they could create a profitable business venture, and it would have been in Vindici's and the HALO Parties' interest for the Gilson machine to work as predicted.

To the extent Plaintiffs claim they relied on representations by Vindici that he "was very familiar" with Gilson machines, *see* ECF No. 199 at 18 (citing Tr. 123:8–20 (Young testimony); *id.* 291:14–19 (Jeremiah testimony), this alleged representation also fails to support a negligent misrepresentation claim.  The Court finds that such a representation is closer to a statement of an opinion than a representation of a fact.  As stated, "[e]xpressions of opinion cannot support a misrepresentation claim."  *Mehaffy, Rider, Windholz & Wilson*, 892 P.2d at 237.  Furthermore, the Athena Parties, themselves, testified that they had doubts about Vindici's familiarity with Gilson machines as early as the initial set-up of the machine, when Young and Jeremiah testified that they saw

20

behavior by Vindici that made it seem as though he was not as familiar with the Gilson machine as he allegedly represented.   *See* Tr. 130:18–131:3, Tr. 293:10–22; *see also* ECF No. 199 at 20 (citing Tr. 130:18–131:3, 293:10–22) ("Soon after the Gilson Machine arrived, it became apparent to Young and Jeremiah that Vindici was not familiar with these machines, and so had misled them into believing that he was more knowledgeable about the machines than he was in actuality.").   Nonetheless, Athena and its employees continued, over the course of "weeks," to spend "hundreds of hours trying to get the machine to work."  ECF No. 199 at 20 (citing Tr. 132:10–133:2, 292:24–293:9).  Young's and Jeremiah's testimony gives the Court doubts as to whether the Athena Parties' continued reliance—over several weeks and over the course of hundreds of employee hours—on Vindici's representation that he was "very familiar with" Gilson machines was reasonable or justifiable.  *See, e.g.*, *Templeton*, 612 F. App'x at 953 ("To state a claim for negligent misrepresentation under Colorado law, a plaintiff must allege: . . . the plaintiff **justifiably relied** on the misrepresentation to his or her detriment.") (emphasis added). For these reasons, the Court finds that Plaintiffs cannot sustain a negligent misrepresentation claim based on any alleged representation by Vindici that he was "very familiar" with Gilson machines.

To the extent Plaintiffs claim they relied on representations by Vindici that "he had [Gilson Machines] operating in several other labs," *see* ECF No. 199 at 18 (citing Tr. 123:8–20 (Young testimony); *id.* 291:14–19 (Combs testimony)), the Court finds that Plaintiffs have failed to carry their burden of showing, by the preponderance of the evidence, that this representation was made.   The only evidence that the Court has

regarding whether this representation was made is the testimony of the parties.   Young and Jeremiah testified that Vindici made this representation in February 2019. Tr. 122:24–123:16, Tr. 291:14–16.   Vindici testified that he did not.   Tr. 526:20–23, Tr. 571:4–18. Given all of the conflicting testimony, the Court does not find that it can rely solely on witness testimony regarding whether Vindici did or did not make this representation.

Finally, to the extent Plaintiffs argue that they relied on more general representations by Vindici about his experience in the industry, affiliation with different companies, etc., when they agreed to have the Gilson machine installed, the Court still finds that these representations do not support Athena's negligent misrepresentation claim.   The Court addresses each of these claimed misrepresentations below.

- Vindici's initial LinkedIn message to Young under the name "Phyto Plant":  As the parties stipulated, "[o]n January 31, 2019, Vindici reached out to Young via LinkedIn inquiring as to the availability of 0% THC oil or distillate."   ECF No. 184 at 30.   Young testified that, in this LinkedIn message, Vindici communicated with Young from an account called "Phyto Plant," which had a plant logo. Tr. 57:5–58:1. Young testified that this led him to believe that Vindici "had another business name under Phyto Plant" and that Phyto Plant is "in the CBD industry" but that Young was "not sure exactly what they do."  Tr. 57:11–12.  However, Young further testified that "[a]fter look[ing] it up," he learned that Vindici is not "affiliated with that company in any way."  Tr. 58:5–7.  Hence, Young's testimony indicates that, first, he was on inquiry notice of the truth of whether Vindici was associated with Phyto Plant, given that the information was

accessible to him once he "looked it up." *See* Tr. 58:7. Second, given that Young was "not sure exactly what [Phyto Plant] do[es]," the Court does not find it credible that the belief that Vindici was associated with Phyto Plant would have induced Young to agree to have the Gilson machine installed at Athena or to work with Vindici. *See* Tr. 58:3–4.

- Vindici's alleged representation that he is a "big player" in the CBD and hemp industry, ECF No. 199 at 9 (citing Tr. 66:24–67:1): The Court finds that this is an unactionable "[e]xpression[] of opinion." *See Mehaffy, Rider, Windholz & Wilson*, 892 P.2d at 237.

- Vindici's alleged representation that he "had this big contract he was trying to fulfill," ECF No. 199 at 9 (citing Tr. 66:24–67:1): The Court finds that this was not a false statement. Evidence has been presented that Vindici had a supply agreement with Curaleaf that he used his relationship with Athena to fulfill. Ex. 258; Tr. 136:11–16, 159:19–21, 461:23–24.

- Vindici's alleged representations that he had "laboratories all over"; that "[h]e had dispensaries in California and on the East Coast"; that "[h]e had hemp grows going on in several different places in the U.S., Oregon in particular"; and that he had "grown hemp in Europe for years" and also had "his own seed strain," ECF No. 199 at 9 (citing Tr. 67:14–22 (Young testimony)): Vindici has testified that he never made these representations and that instead he represented that he had worked with businesses in Europe to import hemp oil but did not own any dispensaries. Tr. 521:5–11, 540:18–21. As stated above,

the Court has found credibility issues with the testimony of the witnesses in this case. Given that it is Plaintiffs' burden to prove their claims by the preponderance of the evidence, the Court finds that the conflicting testimony of witnesses with dubious credibility does not carry Plaintiffs' burden to show that these alleged representations were made.

- Vindici's alleged representation that he had a "lavish office building" in Scottsdale, Arizona, which is pictured on the home page of the HALO-labs.com, when "[i]n fact, the office building was not Vindici's. Instead, it was a virtual office that could be rented on a *per diem* basis, located at 9375 Shea Boulevard in Scottsdale, Arizona," ECF No. 199 at 9–10 (citing Ex. 99; https://unitedvirtualoffice.com/arizona/scottsdale-9375-e-shea-blvd): First, the Court does not find that Plaintiffs have borne the burden, by the preponderance of the evidence, that the specific representation that Vindici "owned" the office building was made. As stated above, where, as here, the only evidence of this representation is the parties' testimony, which the Court has found to be inconsistent, the Court cannot say that Plaintiffs have borne their burden to establish that Vindici made this specific representation. Further, the Court has doubts that any representation about whether Vindici "owned" an office building—as opposed to whether Vindici "used" an office building or whether it was "HALO's office building"—is a "material fact" when it comes to Athena's decision to agree to have the Gilson machine installed. *See, e.g.*, *Templeton*, 612 F. App'x at 953 ("To state a claim for negligent misrepresentation under

Colorado law, a plaintiff must allege: . . . the defendant . . . made a misrepresentation of **material** fact . . . .").  Finally, the Court does not find that if Plaintiffs relied on a representation by Vindici that he "owned" the office building in question, such reliance was not reasonable or justifiable.  *See Templeton*, 612 F. App'x at 953 ("To state a claim for negligent misrepresentation under Colorado law, a plaintiff must allege . . . the plaintiff **justifiably** relied on the misrepresentation to his or her detriment.") (emphasis added).  "A party's reliance on a purported misrepresentation is not justified when the party is aware of or on inquiry notice of the falsity of the representation."  *Rocky Mountain Exploration, Inc. v. Davis Graham & Stubbs LLP*, 420 P.3d 223, 234 (Colo. 2018); *see also Brush Creek Airport, L.L.C. v. Avion Park, L.L.C.*, 57 P.3d 738, 749 (Colo. App. 2002) ("Reliance is not justified when the party is on inquiry notice.").  Here, to support their position that Vindici's alleged representations about ownership of the office space were false, Plaintiffs cite to public websites that would have been available to Plaintiffs that show that the office space was available for *per diem* rental.  *See* ECF No. 199 at 10 (citing "Ex. 99, www.HALO-labs.com homepage"; https://unitedvirtualoffice.com/arizona/scottsdale-9375-e-shea-blvd).  Plaintiffs testified that they did internet research about Vindici when they first contacted and met him.  Tr. 387: 10–15. If that is the case, then Plaintiffs were on inquiry notice about the nature of his use of the office building depicted on HALO's website homepage.

- Vindici's alleged written misrepresentations in his Vertical Integration Plan, Ex. 9, and PowerPoint Presentation, Ex. 1:  Plaintiffs also point to statements made in a Vertical Integration Plan that Vindici presented to Young in March 2019, Ex. 9, and a PowerPoint Presentation slide deck that was intended to induce additional investors to invest in Athena, Ex. 1.  Plaintiffs allege that these are misrepresentations on which Plaintiffs relied in conducting their business dealings with Vindici and the HALO Parties, including buying the Gilson machine.  *See* ECF No. 199 at 10–11.  First, as Defendants point out, ECF No. 201 at 56, Plaintiffs have presented no evidence to support their allegation that they actually relied on these written materials in their business dealings with Vindici and the HALO Parties.  Neither Young nor Jeremiah provided testimony about receiving or reviewing the Vertical Integration Plan or the PowerPoint slide deck.[4]  The only portion of the testimony that addressed these written materials was Vindici's testimony.   *See* Tr. 526:12–19, 559:10–560:4.  Therefore, Plaintiffs have failed to carry their burden to show that Athena and SJHC actually relied on the representations in the written materials.  Plus, many of these representations are arguably unactionable puffery, expression of opinion, or statement of an intention to do something in the future.  *See, e.g.*,

---

[4] In fact, Young's testimony may reflect a lack of familiarity with the concept of "vertical integration":

Q. [Vindici] was willing to [invest in Athena and San Juan Hemp Company] so that he could vertically integrate HALO Laboratories; correct?

A. I guess that's his terminology for it.  Yeah, sure.

Tr. 178: 15–17.

Ex. 9-9, 9-10, 9-27 (representing that Vindici was "a CBD industry pioneer" with "an extensive network of industry professionals, which is why we have been able to source the best hands and resources to assist SJHC and Athena with key resources to manage their operations"; that "HALO has developed a future-proof strategy"; that "[m]ost of the cash infusion required to start and run the . . . business . . . will be provided by HALO"); Ex. 1-4 (describing HALO as an industry "leader"; claiming that HALO's CBD is "found in a vast array of products worldwide"); *see also Branscum*, 984 P.2d at 680; *Mehaffy, Rider, Windholz & Wilson*, 892 P.2d at 237; *Renfro*, 475 F. Supp. 3d at 1247.

For these reasons, the Court finds that Plaintiffs have failed to carry their burden to establish their claim for negligent misrepresentation related to their attempts to get the Gilson machine to work to support Athena's processing operations.

### c.    SJHC's Negligent Misrepresentation Claim Regarding the 2019 Harvest

Finally, Plaintiffs claim that SJHC suffered damages totaling $20,936.20 in weeding labor expenses, $21,540 in additional expenses, and $120,000 in lost profits, all as a result of the HALO Parties urging SJHC's to attempt a harvest from 30 acres, rather than a smaller 5-acre grow that SJHC had previously intended to do.  ECF No. 199 at 22–23, 28, 47; *id.* at 20 (citing Tr. 135:16–20).  According to Plaintiffs, a 5-acre grow would have been successful and profitable.  ECF No. 199 at 23 (citing Tr. 326:18–327:12); *id.* at 28.  Plaintiffs claim that "[b]ased on [Vindici's] misrepresentations, SJHC . . . agreed to expand the size of its hemp harvest from five to 30 acres."  ECF No. 199 at 27.  However, the larger grow failed, and Plaintiffs claim that they only yielded 440 pounds of

biomass from the hemp harvest, which was much lower than the yield Vindici had projected in marketing materials.  ECF No. 199 at 24 (citing Tr. 149:16–18; Ex. Nos. 205-33, 1-6).  According to Plaintiffs, "Athena processed the 440 pounds of hemp into oil but has not sold any of the oil."  *Id.* (citing Tr. 149:19–22).  The Court rejects the negligent misrepresentation claim on this basis, as well.

First, to the extent Plaintiffs rely on Vindici's more general representations about his business and affiliations to support their claim for negligent misrepresentation regarding the SJHC 2019 harvest, the Court rejects the claim on this basis for the same reasons as stated above.  *See supra* Section V.A.1.b.

Plaintiffs further allege that additional misrepresentations by Vindici that were more specific to the SJHC harvest induced them to expand the acreage of the grow, to their detriment.  Plaintiffs allege that they relied on Vindici's representation that "SJHC's entire harvest was 'pre-sold'—so that it would be profitable for SJHC to partner with Vindici and his companies."  ECF No. 199 at 27; *id.* at 21 (quoting Ex. 1-7).  However, the Court does not find that Plaintiffs have established that this representation was false.  Plaintiffs have not established that Vindici lacked an arrangement by which the SJHC crop would have been sold and been profitable for SJHC.  For example, there is evidence that Vindici had a supply agreement with Curaleaf and that he needed additional product to fulfill the agreement when Athena could not produce the amount that he needed. Tr. 645:25–646:9.  Plaintiffs have not established that Vindici would not have been able to sell the yield from the 2019 harvest to Curaleaf or some other buyer.   Plaintiffs allege that Vindici represented that he "had the requisite financial resources to make the larger harvest a

success."  ECF No. 199 at 20 (citing Tr. 135:21–136:25).  However, similarly, they have not established that it was false that Vindici had those resources.  Therefore, these representations do not support a negligent misrepresentation claim.

Plaintiffs also allege that Vindici "said he was going to fund the farm, as far as seeding, bring in machinery . . . he was going to inject a large amount of capital," ECF No. 199 at 21 (quoting Tr. 136:17–25)," and that "HALO will hire key management personnel," including a General Farm Manager and Farm Workers/Field Workers," *id.* (citing Ex. 9-14, 9-15).  As has been discussed, "[a] claim for negligent misrepresentation applies only if there has been a misrepresentation of an existing fact.  Such claim cannot be based solely on the nonperformance of a promise to do something at a future time." *Branscum*, 984 P.2d at 680; *see also Mehaffy, Rider, Windholz & Wilson*, 892 P.2d at 237 ("A promise relating to future events without a present intent not to fulfill the promise is not actionable.").  Plaintiffs have not established that Vindici lacked the present intent to fulfill these promises when they were made.  Further, as discussed, Plaintiffs have not established that Young or anyone else with authority at SJHC even read and relied on the Vertical Integration Plan that contains some of these representations on which Plaintiffs base this claim.

The same reasoning applies to the representation in the PowerPoint slide deck that "[t]he proceeds from the [$1MM] convertible note will also be used to cover some of the basic services and nutrients required for an outdoor grow of industrial hemp."  ECF No. 199 at 21 (citing Ex. 1-4).  Plaintiffs appear to allege that Vindici's representations about the convertible note were false.  However, Young did not testify at all about either

a slide deck, Ex. 1, or a Vertical Integration Plan, Ex. 9, that caused him to believe that there was a convertible note that would fund the 2019 grow and that induced him to expand the grow from 5 to 30 acres. *See* Tr. 32:1–269:11 (Young testimony) (referencing neither Exhibit 1 nor Exhibit 9). Therefore, Plaintiffs have not established that they relied on any representation about the convertible note when SJHC decided to expand the 2019 grow. *See Templeton*, 612 F. App'x at 953. Further, it is not clear that the existence of proceeds from a convertible note would have been a "material fact," given that Vindici had already promised to dedicate any necessary resources to the grow. *See id.*

Plaintiffs also point to alleged misrepresentations in Exhibit 10, which Vindici described as "a basic overview, or what may often be called an executive summary for the convertible note for San Juan Hemp." Tr. 568:19–569:4. Again, Young did not discuss this exhibit in his testimony, and Plaintiffs have not established that it was relied upon by SJHC in the decision to expand the acreage of the 2019 grow. *See* Tr. 32:1–269:11 (Young testimony) (not referencing Exhibit 10). Moreover, that Exhibit states "More than 12 years of experience in hemp growing & extracting techniques." Ex. 10-1. This statement does not indicate whether it refers to HALO or SJHC, the latter of which appears to be the main subject of the document. *See* Ex. 10-1 (including "San Juan Hemp Company – Montrose, CO" in bold lettering at the top of the document). For these reasons, Plaintiffs cannot claim that they detrimentally relied on a representation that HALO had more than 12 years of hemp growing experience.

In general, SJHC's reliance on Vindici's representations about the potential success of the 2019 crop was unreasonable. "If the plaintiff has access to information

that was equally available to both parties and would have led to discovery of the true facts, the plaintiff has no right to rely upon the misrepresentation." *Balkind v. Telluride Mountain Title Co.*, 8 P.3d 581, 587 (Colo. App. 2000) (citing *M.D.C./Wood, Inc. v. Mortimer*, 866 P.2d 1380, 1382 (Colo. 1994)).  Here, SJHC had access to even more information than Vindici about the viability of the 2019 grow because SJHC was more familiar with its own land, resources, and capabilities than Vindici, who did not live in the area and only visited SJHC "five or six times" over the course of the parties' dealings. *See* Tr. 72:7–14.  This, in combination with the fact that the representations relate to Mr. Vindici's promise of future acts to make the harvest a success, rather than facts that then existed or existed in the past, leads the Court to the conclusion that reliance on the representations that the harvest taking place on SJHC's own farm would be a success was not reasonable.

Finally, Plaintiffs have not established the requisite causal link between the alleged misrepresentations and damages pertaining to the harvest. Plaintiffs acknowledge that SJHC had never had a previous harvest that could be compared to the 2019 harvest. ECF No. 199 at 28 (noting that "2019 was SJHC's first harvest—and hence the company had no operational history"); Tr. 137:7–10 (Young's testimony that before the 2019 growing season, he had "[l]imited experience" with farming), Tr. 318:23–25 (Trojan's testimony that "this was the first year the farmer was planting"). Therefore, the only evidence of the profits from a harvest SJHC could have had on a smaller piece of acreage comes from Plaintiffs' expert witness, Rick Trojan. Trojan testified that 30 acres could have yielded between 29,500 pounds and 44,700 pounds, which would have been sold

for between $497,000 and $753,000.   Tr. 335:1–13.   As stated, instead of this yield, Plaintiffs claim they had a yield of approximately 440 pounds.   However, Trojan testified that he "didn't actually see how much hemp was harvested" and that he conducted his review in the fall of 2020, one year after the harvest.   Tr. 336:4–15.   He affirmed that "there was no way for [him] to verify whether the [Plaintiffs' estimate that the crop yield of] 440 pounds was an accurate estimate" and that he did no "other investigation to determine whether that estimate was accurate."   Tr. 336:16–21, 337:3–5.   Although Trojan saw photos and videos, he acknowledged that he "ha[d] no way of knowing whether the information provided to [him] was a view of all 30 acres."   Tr. 336:25–2. Hence, Trojan's estimate of SJHC's lost profits does not appear to be credible.   Moreover, Young affirmed that SJHC "didn't have any other grows in 2019 besides the one it had contemplated with HALO and [Green Earth]."   Tr. 241:21–24; *see also* Tr. 242:4–6. However, Trial Exhibit 226, SJHC's Profit and Loss Statement, shows that SJCH had $161,942.19 in income from "Crop Sales" in 2019.   Ex. 226.002.   This income from crop sales remains unexplained by the testimony but a reasonable interpretation is that there was a harvest, and this harvest was sold for $161,942.19.   For all of these reasons, Plaintiffs have failed to establish that SJHC suffered more than $120,000 in lost profits damages from the harvest.

### 2.  Fraudulent Concealment

"The elements of the tort of fraudulent concealment are: (1) the defendant's concealment of a material existing fact that in equity or good conscience should be disclosed; (2) the defendant's knowledge that the fact is being concealed; (3) the plaintiff's

ignorance of the fact; (4) the defendant's intent that the plaintiff act on the concealed fact; and (5) the plaintiff's action on the concealment resulting in damage." *Sussman v. Stoner*, 143 F. Supp. 2d 1232, 1239 (D. Colo. 2001) (citing *Burman v. Richmond Homes Ltd.*, 821 P.2d 913, 918 (Colo. App. 1991)); *see also Barfield v. Hall Realty, Inc.*, 232 P.3d 286, 292 (Colo. App. 2010). "A defendant has a duty to disclose to a plaintiff with whom he or she deals material facts that 'in equity or good conscience' should be disclosed." *Sussman*, 143 F. Supp. 2d at 1239 (quoting *Mallon Oil Co. v. Bowen/Edwards Assocs., Inc.*, 965 P.2d 105, 111 (Colo. 1998)).

"To determine whether the circumstances of a particular case give rise to a duty to disclose in 'equity or good conscience,' *Mallon Oil* directs a court to the RESTATEMENT (SECOND) OF TORTS § 551(2) for guidance." *Id.* Section 551(2) provides, in pertinent part, that:

> (2) One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated,
>
> . . .
>
> (e) facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts.

Restatement (Second) of Torts § 551(2) (Am. L. Inst. 1965).

Plaintiffs assert a fraudulent concealment claim against Defendants that is based on substantially the same conduct underlying their negligent misrepresentation claim, except this time framed as Vindici concealing "the truth about his background and

expertise, as well as the (limited) success that his companies had had in the hemp industry." *See* ECF No. 199 at 29.  Plaintiffs allege the damages from Vindici's fraudulent concealment were the same as the damages underlying the negligent misrepresentation claim, discussed above.  *Id.* at 29–30.  However, Plaintiffs have not established that, in fact, Vindici's businesses had "[]limited[] success . . . in the hemp industry" and that Vindici hid this fact from Plaintiffs during the course of their dealings.  *Cf. id.*  For this reason, and for the same reasons that the Court finds that the negligent misrepresentation claim fails, discussed above, the Court finds that Plaintiffs' fraudulent concealment claim fails.

### 3. Declaratory Judgment

"Under Section 1 of the Declaratory Judgment Act, 28 U.S.C. § 2201, a district court may, upon the filing of an appropriate pleading, declare the legal relations of interested parties, and the declaration entered has the force and effect of a final judgment or decree."  *Patton v. Denver Post Corp.*, 379 F. Supp. 2d 1114, 1116 (D. Colo. 2005) (citing *Security Ins. Co. of New Haven v. White*, 236 F. 2d 215, 220 (10th Cir. 1956)). The Declaratory Judgment Act provides, in pertinent part, that, "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, **may** declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."  28 U.S.C. § 2201(a) (emphasis added).  "Because of the Act's use of the word 'may,' the Supreme Court has held it confers upon courts the power, but not the duty, to hear claims for declaratory judgment."  *Mid-Continent Cas. Co. v. Village at Deer Creek Homeowners*

*Ass'n, Inc.*, 685 F.3d 977, 990 (10th Cir. 2012) (citing *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286–87 (1995)).  The Act "confers discretion on the courts rather than an absolute right upon the litigant."  *Wilton*, 515 U.S. at 287; *see also Public Affairs Assocs., Inc. v. Rickover*, 369 U.S. 111, 112 (1962) ("The Declaratory Judgment Act was an authorization, not a command. It gave the federal courts competence to make a declaration of rights; it did not impose a duty to do so.").

> In determining whether to exercise their discretion, district courts should consider the following factors:
>
>> [1] whether a declaratory action would settle the controversy; [2] whether it would serve a useful purpose in clarifying the legal relations at issue; [3] whether the declaratory remedy is being used merely for the purpose of procedural fencing or to provide an arena for a race to *res judicata*; [4] whether use of a declaratory action would increase friction between our federal and state courts and improperly encroach upon state jurisdiction; and [5] whether there is an alternative remedy which is better or more effective.

*Mid-Continent Cas.*, 685 F.3d at 990 (quoting *State Farm Fire & Cas. Co. v. Mhoon*, 31 F.3d 979, 983 (10th Cir. 1994)).

Plaintiffs ask the Court to declare they should be paid for processing the Full Spectrum Oil that was shipped to them on July 17, 2019 ECF Nos. 199 at 30, 186 at 4 ("Plaintiffs seek a declaratory judgment that Plaintiffs are not obligated to purchase this Full Spectrum Oil.  Instead, Defendants should pay Plaintiffs for the processing work that Plaintiffs performed and for which they have never been compensated.").  This claim pertains to the same oil that is at least one basis of Defendants' unjust enrichment counterclaim/third-party claim and that is the basis of Defendants' motion to amend the pleadings and Pretrial Order to include counterclaims/third-party claims for civil theft and

conversion.   *See infra* Sections V.B.4., VI.   As set forth in the section regarding Defendants' Motion to Amend, at best there are questions about what amount of oil was actually processed and when. Given the contradictory testimony and the dubious credibility of the witnesses as to this issue, the Court declines to exercise its discretion to declare that Athena should be paid for the processing and does not have to pay for the oil.

Such a declaration would not "serve a useful purpose in clarifying the legal relations at issue."   *See id.*   Other claims in this case, particularly Counterclaim/Third-Party Plaintiffs' claim for unjust enrichment regarding the oil and Counterclaim/Third-Party Plaintiffs' claims for fraud and negligent misrepresentation concerning their investment in the SJHC business, serve a better use in "clarifying the legal relations at issue."  *See id.* Hence, "there is an alternative remedy which is better or more effective."  *See id.*

Even if the Court were to consider whether to judicially create a contract on which the parties themselves never bothered to come to an agreement or a meeting of the minds, the Court would decline to do so.  The record concerning the parties' relationship abounds with a lack of agreement and clarity concerning the nature of the parties' relationship, dealings, or agreements.  There seem to have been instances when Athena processed oil for HALO, and HALO paid for the processing without issue or dispute. However, the lack of clarity surrounding the parties' relationship, in general, as well as their course of dealings regarding Athena's processing of HALO's oil and their course of conduct concerning the particular batch of oil in question, in particular, gives the Court pause in determining whether to exercise its discretion to grant Plaintiffs' request to

essentially write the parties' agreement for them.   *See* Ex. 56-8 (email from Vindici to Cyrstal and Young, stating "there is 88kg of FSO at the UPS store waiting for pickup. . . . In preparation for processing please pickup the FSO and run a quick lab test in accordance with each tag"); *id.* (email from Crystal to Vindici stating that "[w]e already picked all of these up 2 days ago and have started processing them"); *id.* (email from Vindici to Crystal saying, "Well that's nice but not what I wanted.  Please STOP processing as I am currently not in agreement regarding the tolling or price to process the order.").[5] The Court declines to exercise its discretion as Plaintiffs request and DENIES Plaintiffs' claim for declaratory judgment.

### B.   Counterclaim/Third-Party Plaintiff's Claims

### 1.  Fraud

"To state a claim for fraudulent misrepresentation, a plaintiff must plausibly allege: '(1) a fraudulent misrepresentation of material fact was made by [the defendant]; (2) the [plaintiff] relied on the misrepresentation[ ]; (3) the [plaintiff] ha[d] the right to rely on, or w[as] justified in relying on, the misrepresentation; and (4) the reliance resulted in damages.'" *Dean v. Wright Med. Tech., Inc.*, 593 F. Supp. 3d 1086, 1096 (D. Colo. 2022) (quoting *M.D.C./Wood, Inc. v. Mortimer*, 866 P.2d 1380, 1382 (Colo. 1994)) (alterations in original); *see also Bristol Bay Prods., LLC v. Lampack*, 312 P.3d 1155, 1160 (Colo. 2013) ("[A] plaintiff seeking to prevail on a fraud claim must establish five elements: (1) that the defendant made a false representation of a material fact; (2) that the one

---

[5] *See also infra* Section V.B.4. (discussing the fact that Crystal's statement that Athena had already started processing the oil had been untrue).

making the representation knew it was false; (3) that the person to whom the representation was made was ignorant of the falsity; (4) that the representation was made with the intention that it be acted upon; and (5) that the reliance resulted in damage to the plaintiff.").  Further, the legal elements for a claim of fraudulent concealment are set forth above, *supra* Section V.A.2., and reincorporated here.  Here, the Court finds that HALO has failed to prove by a preponderance of the evidence that the alleged statements of fact were misrepresentations or that he was justified in relying on any such representations.  *See Dean*, 593 F. Supp. 3d at 1096.

Regarding whether certain alleged representations were false, the Court first notes that, as with negligent misrepresentation, "[a] mere expression of opinion as to the happening of a future event is not actionable."  *Burman v. Richmond Homes Ltd.*, 821 P.2d 913, 921 (Colo. App. 1991) (citing *Leece v. Griffin*, 371 P.2d 264 (Colo. 1962)).  Similarly, "[a] claim for the tort of fraud cannot be predicated upon the mere nonperformance of a promise or contractual obligation or upon the failure to fulfill an agreement to do something at a future time."  *H&H Distributors, Inc. v. BBC Int'l, Inc.*, 812 P.2d 659, 662 (Colo. App. 1990) (citing *State Bank of Wiley v. States*, 723 P.2d 159 (Colo. App. 1986)).  "However, a promise concerning a future act, when coupled with a present intention not to fulfill that promise, can be actionable fraud."  *Id.* (citing *Kinsey v. Presson*, 746 P.2d 542 (Colo. 1987)).  Here, although a promise, coupled with a present intent not to fulfill the promise, can serve as the basis for a fraud claim, *see id.*, for the reasons stated below where the Court addresses the promissory estoppel counterclaim, the Court

finds that the Athena Parties did not make promises about conferring an ownership interest in Athena and SJHC to HALO.  *See infra* Section V.B.3.

This leaves as the only basis for the fraud claim the allegation that the Athena Parties falsely represented that they could and had been producing 0% THC distillate at the time that they first met Vindici and began business dealings with HALO through him. First, HALO has failed to show by a preponderance of the evidence that these representations were false.  HALO relies largely on text messages from Crystal to Young that HALO argues reflect an incorrect understanding of how to produce 0% THC distillate and demonstrate that the Athena Parties did not know how to make this product.  *See* Ex. 205.  However, Young, Jeremiah, and Crystal all testified that Crystal was unfamiliar with the correct process to produce the distillate, but Young and Jeremiah, who were involved in production, were familiar.  Tr. 442:15–18, 280:10–11, 284:10–15, Tr. 50:10–24, 52:9– 10. As previously indicated, the Court finds that all parties had credibility issues and given the conflicting testimony on this issue, the Court finds the HALO parties have failed to carry their burden on this issue.

On top of that, there is no evidence that testing of the product that HALO received from the Athena Parties revealed that it was fraudulent product or not true 0% THC distillate.  In fact, Vindici received a sample of 0% THC distillate from Athena at the very start of the relationship and had it tested. Ex. Nos. 101, 23-2–23-8.  After emailing Young the test results, Vindici stated that he was "[s]uper excited about the future business possibilities discussed as well as the business at hand."  Ex. 23-1.  Therefore, there is no evidence that this initial test sample from February of 2019 was not a satisfactory product.

Moreover, there is no evidence that Vindici's customer Curaleaf (which he described as "the largest dispensary owner in North America," Tr. 520:14–15), or any other recipients of product that he supplied, complained about the product being bad, fraudulent, or not meeting requirements. In fact, Vindici testified that his entire supply contract with Curaleaf was realized, through "the end of the contract date, receipt of the last payment, receipt of the last shipment," and that Curaleaf did not end its relationship with Vindici or HALO until after this lawsuit was filed. Tr. 521:1–4, 643:7–18. Therefore, HALO has not proven by a preponderance of the evidence that the product it received from the Athena Parties was fraudulent or otherwise problematic and resulted in damages. *See Dean*, 593 F. Supp. 3d at 1096.

Even if the Athena Parties had falsely represented to HALO, through Vindici, that it could and was producing 0% THC distillate, HALO has not established that any reliance on such alleged misrepresentations was reasonable or justifiable. *See id.* (requiring for a claim of fraud that the plaintiff "ha[d] the right to rely on, or w[as] justified in relying on, the misrepresentation"). Vindici testified that, without the Gilson machine, and "until I found out they bought a different -- and actual Flash 150 during the relationship . . . there was no proof that they could make zero THC-free oil any other way other than by adding hemp seed oil," which is not a valid method for producing 0% THC distillate. Tr. 692:3–9,290:6–8, 446:1–12. However, Vindici did not order the Gilson machine for installation at Athena until April 30, 2019, and the machine was returned on July 16, 2019. Ex. 101.

Furthermore, Vindici regularly had access to the Athena facility and had toured Athena's facility as early as February of 2019. Tr. 535:18–536:13. He testified that he

saw no Gilson machine on the premises at that time.  Tr. 692:10–13. Therefore, applying logic to Vindici's testimony, if Athena did not have a Gilson machine upon the start of their relationship in January and February of 2019, Vindici would have known that they did not have the capability of making 0% THC distillate.  In fact, Vindici confirmed in his testimony that "when [he] inspected the lab, [he] knew they didn't have the Gilson" and that "[t]hat's why [he] helped them buy it."  *Id.*  "If the respondents have access to information that was equally available to both parties and would have led to the true facts, the respondents have no right to rely upon the false representation."  *M.D.C./Wood*, 866 P.2d at 1382 (citing *Cherrington v. Woods*, 29 P.2d 226 (1955)).  Here, Vindici had access to sufficient information to learn whether Athena could produce and was producing valid 0% THC distillate for HALO.  He has maintained that he is a sophisticated and experienced businessman in this industry (and, as discussed above, successfully defended against Plaintiffs' claims to the contrary).  He cannot now be heard to claim that he was duped by parties that he claims lied about being inexperienced newcomers to the industry when he had every opportunity to tour and become familiar with their facilities and operations and to test their product himself.  Therefore, he did not justifiably rely on any alleged misrepresentations concerning Athena's production of 0% THC distillate.

The same can be said about any claim for fraud surrounding SJHC's "ability to manage . . . the hemp cultivation."  *See* ECF No. 186 at 9.  Vindici also toured and had access to the SJHC farmland and operations and had sufficient notice of the state, scale, and sophistication of that operation, as well.  For example, he had enough information to put together the Vertical Integration Plan and Convertible Note documents detailing

SJHC's operations.  Ex. Nos. 1, 9, 10.  Again, he cannot now be heard to claim that he justifiably relied on any rosy predictions by SJHC regarding the success of its first-ever hemp harvest.  In any case, such predictions would also likely be an unactionable "expression of opinion as to the happening of a future event."  *See Burman*, 821 P.2d at 921.  For these reasons, HALO has failed to carry its burden to prove its fraud claim against the Counterclaim and Third-Party Defendants.

### 2.  Negligent Misrepresentation

Colorado law regarding negligent misrepresentation is stated above, and the Court reincorporates it here.  *See supra* Section V.A.1.  Here, HALO brings its negligent misrepresentation counterclaim "[f]or the precise reasons set forth in the analysis of HALO's fraud claim."  ECF Nos. 201 at 62, 186 at 8–9 (describing the same basis for "the affirmative claims . . . for fraud, negligent misrepresentation, promissory estoppel, and unjust enrichment").  Further, HALO requests the same damages for its negligent misrepresentation counterclaim as its fraud claim and argues that it should recover these damages "once, not cumulatively, for both the fraud and negligent misrepresentation claim."  ECF No. 201 at 63.  Given that the basis of the negligent misrepresentation counterclaim is the same as the fraud claim, the Court also DENIES HALO's request for judgment in its favor on the negligent misrepresentation claim for the same reasons it denies relief on the fraud claim, discussed above.

### 3.  Promissory Estoppel

"The elements of a promissory estoppel claim are: (1) the promisor made a promise to the promisee; (2) the promisor should reasonably have expected that the

promise would induce action or forbearance by the promise[e]; (3) the promisee in fact reasonably relied on the promise to the promisee's detriment; and (4) the promise must be enforced to prevent injustice."  *Walshe v. Zabors*, 178 F. Supp. 3d 1071, 1085 (D. Colo. 2016) (citing *Marquardt v. Perry*, 200 P.3d 1126, 1129 (Colo. App. 2008)).  "A promise is 'a manifestation of intention to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been made."  *Id.* (quoting Restatement (Second) of Contracts § 2(1)).  "A promise may be stated in words . . . or may be inferred wholly or partly from conduct."  *Id.* (quoting Restatement (Second) of Contracts § 4).  "It must also be sufficiently specific to allow a court to understand the nature of the obligation."  *Id.* (citing *George v. Ute Water Conservancy Dist.*, 950 P.2d 1195, 1199 (Colo. App. 1997)).

Here, HALO claims that it "was promised an ownership interest in Athena and SJHC in exchange for its investment of funds in the form of equipment and processing." ECF No. 201 at 64.  The parties agree that there is no written agreement for HALO or Vindici to invest a certain amount into Athena or SJHC in exchange for an ownership interest in those companies.  *See* ECF No. 186 at 4 (Plaintiffs' statement of their claims and defenses, stating "the parties continued to negotiate a joint venture involving contributions of capital and labor from Defendants – in exchange for Defendants' partial ownership of the farming business . . . and the processing business"); *id.* at 6 (Defendants' statement of their claims and defenses, stating "no formal written agreement was executed").

Further, even in the absence of a formal agreement, HALO has also pointed to no written, documentary evidence of a promise made by the Counterclaim and Third-Party Defendants regarding HALO obtaining an ownership interest in Athena and SJHC. Therefore, the Court only has the parties' testimony and other evidence of their course of conduct, in the form of emails exchanged in which the parties negotiated the terms of a potential agreement.  As the Court has discussed above, the parties' testimony is unreliable in various ways.  Therefore, the conflicting testimony from Young that he never made a promise that HALO would have an ownership interest in Athena and SJHC and from Vindici that Young did make such a promise, alone, does not carry HALO's burden of proving its promissory estoppel claim.  *Compare* Tr. 90:18–25 (Young testimony ("Q. What promises, if any, did you ever make to Mr. Vindici that he would get equity ownership in your companies?  A.  I agreed that if he brought to the table what we had talked about, that we would absolutely nail this down and have an agreement.  Q.  And did you ever form an agreement like that in your own mind?  A.  No."), *with* Tr. 542:5–14 (Vindici testimony that "we started talking about percentages ownership in [Athena] to help upgrade the lab and its capabilities.  As far as the farmland, [Young] said he was the sole owner and therefore offered me I believe it was non-controlling 45 percent interest").

Even if HALO bases its claim on an alleged promise "inferred wholly or partly from conduct," the promise still "must also be sufficiently specific to allow a court to understand the nature of the obligation."  *Walshe*, 178 F. Supp. 3d at 1085 (quoting Restatement (Second) of Contracts § 4) (citing *George*, 950 P.2d at 1199).  Here, as stated, there was no written agreement between the parties.  The conduct of the Counterclaim/Third-Party

Defendants was that they were failing or declining to execute the written agreements that Vindici sent them.   *Compare* Ex. 11 (Letter of Intent drafted by Vindici, contemplating conferral of ownership rights), *with* Ex. 12 (Letter of Intent drafted by Crystal, contemplating a loan); *see also* Tr. 580:25–581:12.   This conduct does not "manifest[] [an] intention to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been made."   *Walshe*, 178 F. Supp. 3d at 1085 (quoting Restatement (Second) of Contracts § 2(1)).   Further, even though the Counterclaim/Third-Party Defendants were accepting money from HALO, some of this was for oil processing services that Athena performed.   Any additional money accepted cannot be construed as a conduct manifesting a promise because a promise "must also be sufficiently specific to allow a court to understand the nature of the obligation."   *Walshe*, 178 F. Supp. 3d at 1085 (citing *George*, 950 P.2d at 1199).   There is no evidence to show that the Counterclaim/Third-Party Defendants manifested a specific enough intent to bestow an ownership interest in Athena and SJHC to HALO by accepting money from HALO, which could have been interpreted as a loan or some other manifestation of an attempted partnership or joint venture among the parties.   *See, e.g.*, Ex. 53-3 (July 27, 2019 email from Vindici to Young acknowledging that "it is obvious the ownership concept originally proposed is never going to pan out the way I wanted it to," but still expressing that Vindici is "very open to additional investment and support of [Young's] operations").   For these reasons, the Court DENIES HALO's request for judgment in its favor on the claim for promissory estoppel.

### 4.  Unjust Enrichment

"Unjust enrichment is a form of quasi-contract or a contract implied in law." *Salzman v. Bachrach*, 996 P.2d 1263, 1265 (Colo. 2000).  "As such, it is an equitable remedy and does not depend on any contract, oral or written.  The theory does not require any promise or privity between the parties." *Id.* (citations omitted).  "Rather, it is a judicially created remedy designed to avoid benefit to one to the unfair detriment of another." *Id.* "In Colorado, a plaintiff seeking recovery for unjust enrichment must prove: (1) at plaintiff's expense (2) defendant received a benefit (3) under circumstances that would make it unjust for defendant to retain the benefit without paying." *Id.* (citing *DCB Constr. Co. v. Central City Dev. Co.*, 965 P.2d 115, 119–20 (Colo. 1998)).  "If the elements of unjust enrichment are proved, the defendant who received the benefit is normally required to make restitution to the plaintiff in the amount of the enrichment the defendant received." *Harris Grp., Inc. v. Robinson*, 209 P.3d 1188, 1205 (Colo. App. 2009).

HALO has put forth three bases for its unjust enrichment claim: (1) that, for substantially the same reasons that HALO brings its fraud and negligent misrepresentation claims, the Athena Parties unfairly received $1,561,568 from HALO paid for processing oil into 0% THC distillate; (2) that even if that oil processing was legitimate and not fraudulent, HALO overpaid for it by $447,234.90; and (3) that the Athena parties have retained $177,600-worth of HALO's oil since July of 2019.  *See* ECF No. 201 at 66–67.  The Court addresses each aspect of this claim below.

First, for the same reasons that HALO's fraud and negligent misrepresentation claims fail, so too does its claim for unjust enrichment on the same basis in the amount of $1,561,568.  Second, HALO has not established that the circumstances under which it

made the alleged overpayments totaling $447,234.90 would make it "unjust for [the Athena Parties] to retain the benefit without paying."  *See Salzman*, 996 P.2d at 1265. HALO has not established that this alleged surplus payment was not directed toward the attempted joint venture between the parties, rather than the invoiced processing services. *See* ECF No. 201 at 66–67; ECF No. 201-1 (citing Ex. Nos. 13, 14, 15, 16, 230).  In fact, only one of the payments listed in Exhibit 230 (a payment made on February 4, 2019) specifically refer to an Athena "Invoice."  Ex. 230; *see also* ECF No. 201-1 at 1.  HALO has pointed to no explanation in the record of the purpose of the payments listed in the cited exhibits or testimony that these payments were intended solely to pay the amounts on the processing invoices.

As the Court has noted, HALO's payments for oil processing were occurring at the same time that the parties were attempting to jointly venture into the market of producing and supplying 0% THC distillate.  They each partook in business dealings and paid monies to make this venture a profitable reality, all without formal agreements in place. The parties assumed the risk of any payments they made under these circumstances, and the Court does not find that any such payments were made under unjust circumstances.  Given that HALO has not established that the alleged $447,234.90 surplus was not associated with the attempted venture, rather than specific oil processing services, the Court finds that damages for unjust enrichment is not warranted on this basis.

However, the Court does find that the Athena Parties retained HALO's oil and benefited from it "under circumstances that would make it unjust for [the Athena Parties]

to retain the benefit without paying." *Salzman*, 996 P.2d at 1265.  The Athena Parties obtained the oil from the UPS store after Vindici shipped it.  *See* Ex. 56-8.  The Athena Parties never returned the oil (in processed or crude form) to Vindici.  *See* Tr. 205:2–16 (Young testimony) (affirming that "Athena has not returned any of that oil to HALO").  That, however, is where the agreement on this issue ends and murkiness, if not outright deception, ensues.

On July 25, 2019, Vindici emailed Crystal requesting that the 88 kilograms of oil in "8kg buckets" be picked up from the UPS store and "[i]n preparation for processing," be run through a lab test.  Ex. 56-8.  This was in the midst of email discussions in which the parties discussed disagreements about the terms of a written agreement between them, including about the pricing for the 0% THC distillate that Athena was processing and sending to HALO.  *See* Ex. 56.  Crystal responded, "[w]e already picked all of these up 2 days ago and have started processing them."  Ex. 56-8.  In turn, Vindici responded, "Well that's nice but not what I wanted.  Please STOP processing as I am currently not in agreement regarding the tolling or price to process the order."  *Id.*  Crystal's response email stated: "Ok, I told them to stop all processing but they are already through 54kilos just an FYI."  Ex. 56-7.  The Athena Parties have continued to maintain that they stopped processing any more of HALO's oil as of this July 25, 2019 email exchange when Vindici asked them to.  *See, e.g.*, Tr. 216:18–22.

However, communications among the Athena Parties, themselves, reveals a different story.  In particular, on July 29, 2019—four days after the above email exchange—Young texted Jeremiah asking, "How many total kilos do we have processed

for David right now?"  Ex. 218.013.   Jeremiah responded, "I can't remember the total number I think we have gone threw [sic] 4 buckets…it's all written down in the book back there if your home."  *Id.*   If Athena had, in fact, processed four of the eight-kilogram buckets, as Jeremiah stated, then Athena would have only processed 32 kilograms—not 54 kilograms—as of four days after Crystal represented to Vindici that Athena had already processed 54 kilograms.  Young then sent the following text to Jeremiah:

> We need to step up the processing to 12 kilos per day.  If David shows up this week and we dont truly have 54 kilos processed it's going to be a problem.  Not to mention we all need the money.

Ex. 218.013.  Hence, four days after Vindici told them to stop processing, Young told Jeremiah to "step up the processing" so that Athena would "truly have 54 kilos processed," as Crystal had represented to Vindici.  *See id.*; Ex. 56-7.  The Athena Parties have attempted to explain away this apparent deceit by saying that they had already started processing 54 kilograms of oil before Crystal's July 25 email but that the processing takes time and has to be completed once started.  *See, e.g.*, Tr. 216:18–22, 217:7–10.  However, the Court does not find the parties' testimony about this issue credible.

The Court supposes it is possible that the Athena Parties had **started** processing 54 kilograms of oil before Crystal's July 25 email stating that they had were "already through 54kilo"; that Jeremiah's July 29 text that they were probably "thr[ough] 4 buckets" (or 32 kilograms) was referring to the amount of **completed** processing; and that Young's text to Jeremiah to "step up" the processing was referring to **completion** of processing that had already begun.  Perhaps, then, there is a perfectly innocent explanation amid this web of apparent discrepancies among these communications.  However, there are

myriad other apparent deceptions that took place surrounding this oil that, the Court finds, strains the credulity of any such innocent explanation.

For example, after Crystal told Vindici that they had already started processing 54 kilograms of oil, he asked, "Did anyone test it?"  Ex. 56-7.  She responded on July 25, 2019 at 4 p.m., "I know Brenden did the testing on all of the buckets that came in because new policy is that we test absolutely everything that comes through our doors and leaves." *Id.*  These emails were still on July 25, 2019.  *Id.*  Much like the issue regarding the processing of the oil, the communications within the Athena Parties once again tells a different story.  At 4:02 p.m., Crystal texted Young: "[Brenden] is going to back date the tests to two days ago so we can tell David that we test everything when it comes into the building or leaves the building."  Ex. 205.022.  These communications appear to indicate that the Athena Parties' plan was to maintain a ruse about the status of their testing—and likely also their processing—of the oil in question.  The Court further notes that HALO has demonstrated that Crystal originally produced for litigation an altered version of the text message to Young that removed any reference to backdating.  *See* Ex. 202.022 (showing a text message to Young at 4:02 that reads only, "tell David that we test everything when it comes into the building or leaves the building.").  Crystal testified at trial that she altered this text message when producing it for litigation "because [she] did not want Mr. Vindici or the Court to see that [she] had deleted it – or that [she] had backdated those tests." Tr. 449:16–18; *see also* Tr. 436:15–20.

Overall, the Court finds that these are "circumstances that would make it unjust" for the Athena Parties to retain HALO's oil or any benefit from it.  *See Salzman*, 996 P.2d

at 1265.   Further, HALO has pointed to evidence that the Athena Parties "received a benefit" from the oil, rather than just having it sit in their facility.   *See id.*   On September 25, 2019, Crystal texted Young: "Holzman's people that we sent the samples of crude to are asking about a CofA to go with the samples???   No one here seems to know."   Ex. 205.031.   Young responded, "It was the Crude from Vindici" (with no ending punctuation). *Id.*   Crystal testified that she interpreted this text as Young asking whether it was the crude from Vindici, rather than stating as much.  Tr. 477:11–478:7. The Court does not find that testimony to be credible.   Crystal then responded "Ok, was it mine?" and then responded again, "As in the crude I bought from you guys and had melted in my room?"  Ex. 205.031– 032.   Regardless of Crystal's attempts to testify otherwise, *see* Tr. 478:13–22, which the Court also does not find credible, the Court finds that these text messages demonstrate that the Athena Parties retained a benefit from HALO's oil under unjust circumstances. *See Salzman*, 996 P.2d at 1265.

The final element of unjust enrichment to address is whether the Athena Parties retained a benefit "at [HALO's] expense."   *See id.*   Again, no party disputes that HALO has to this day been deprived of the oil.   Therefore, the question becomes the value of the oil that HALO has been deprived of, which also informs the appropriate damages.  As stated above, "[i]f the elements of unjust enrichment are proved, the defendant who received the benefit is normally required to make restitution to the plaintiff in the amount of the enrichment the defendant received."  *Robinson*, 209 P.3d at 1205.   Counsel for the Athena Parties argued at trial that the proper remedy should be to return the oil to HALO. Tr. 710:8–13.   However, given the text messages appearing to show that the Crystal had

"bought [the oil] from [Athena] and had melted in [her] room" and that she used at least some of this oil to send samples to one of her own clients.  Ex. 205.031–032.  Given this text message and the loose relationship that the Athena Parties have demonstrated with the truth surrounding the status of this oil, the Court disagrees that simply returning the oil to HALO is the proper remedy here.  Instead, HALO was deprived of the benefit of using the oil, which had value, in some other way at the time Vindici sent it to the Athena Parties.

Therefore, the Court finds that the value of the oil at the time HALO sent it to the Athena Parties, plus prejudgment interest "at the rate of eight percent per annum compounded annually," is the proper "amount of the enrichment the defendant received." *See Robinson*, 209 P.3d at 1205; Colo. Rev. Stat. § 5-12-102(1)(a)–(b); *see also Quad Constr., Inc. v. Wm. A. Smith Contracting Co., Inc.*, 534 F.2d 1391, 1394 (10th Cir.1976) ("In federal court diversity jurisdiction contract cases, interest questions are determined by state law.").  Prejudgment interest shall accrue starting July 25, 2019 because the Court finds that is the date when the unjust circumstances began and therefore the date when the "property ha[d] been wrongfully withheld."   *See* Colo. Rev. Stat. § 5-12-102(1)(a).

Regarding the value of the 88 kilograms of oil in question, HALO argues that the damages should be $177,600.  ECF No. 201 at 66.  This figure comes from a July 31, 2019 email from Vindici to Young with an invoice for $177,000 for the value of 118 kilograms of oil, plus $600 in shipping.  Ex. 54-1, 54-3.  However, the Athena Parties point out that in a proposed True Up Agreement dated July 27, 2019, Vindici had valued this

oil at $125,000.  Ex. 75-1.  The Court credits the July 27, 2019 valuation of $125,000 that Vindici made closer in time to July 25.  Further, the Court does not find that the shipping costs are properly part of "the amount of the enrichment [the Athena Parties] received" because Vindici willingly shipped them the oil; the unjust circumstances giving rise to this claim did not begin until the oil had already arrived.  *See Robinson*, 209 P.3d at 1205. Given that Vindici valued 118 kilograms of oil at $125,000, the Court finds that the proper estimate of the value of the 88 kilograms at the center of the unjust enrichment claim was $93,220.34 as of July 25, 2019.  That amount, plus prejudgment interest, is the proper damages award on HALO's unjust enrichment claim.

### C.    Additional Issues

The parties have raised a few additional issues:  First, both sides claim that they should be able to pierce the corporate veil and recover damages against each individual and entity against whom and which they have asserted claims.  ECF Nos. 201 at 67, 199 at 42–46.  In addition, HALO argues that it is entitled to an award of attorney fees.  *Id.* at 70.  The Court addresses each additional issue below.

### 1. Alter-Egos

First, the Court notes that Plaintiffs' request to disregard the corporate forms of HALO and Green Earth and to consider them as alter-egos of Vindici is moot, given that Plaintiffs have not prevailed on any claim against those parties.  Next, HALO also argues that the Court should find that Athena, SJHC, CBD Extracts, YCS, Honeycombs, Young, and Crystal are alter-egos.  Tr. 721:25–722:16. The Court notes that there is a problem with whether HALO has preserved this issue for trial.  Although HALO's counterclaims

allege this claim, ECF No. 37 ¶¶ 136–67, after the Court admonished the parties that issues not raised in the Final Pretrial Order would be waived and allowed opportunities to amend the Proposed Pretrial Order, ECF Nos. 162, 173, 181, 185, 186, HALO still did not state in the Final Pretrial Order that these Athena Parties and Third-Party Defendants should be considered alter egos and instead only stated that HALO and Green Erath should not be considered alter egos to Vindici, ECF No. 189 at 5–9.  However, the Court notes that "piercing the corporate veil is an equitable remedy" and is "applied . . . to avoid inequitable results."  *N.L.R.B. v. Greater Kan. City Roofing*, 2 F.3d 1047, 1053–54 (10th Cir. 1993) (quoting 1 Fletcher Cyclopedia, § 41.20).   For the reasons stated below, inequitable results would flow from declining to pierce the corporate veil.  Therefore, to avoid inequity, but with some reluctance and frustration, the Court will consider HALO's argument that the Athena Parties and Third-Party Defendants listed above should be treated as alter egos.

"To determine whether piercing the corporate veil is appropriate, the Court must first inquire into whether the corporate entity is the alter ego of the shareholder."  *Estate of Bogue v. Adams*, 405 F. Supp. 3d 929, 943 (D. Colo. 2019) (quoting *In re Phillips*, 139 P.3d 639, 644 (Colo. 2006)).  "An alter ego relationship exists when the corporation is a 'mere instrumentality for the transaction of the shareholders' own affairs, and there is such unity of interest in ownership that the separate personalities of the corporation and the owners no longer exist.'"  *Id.*

> In establishing whether such unity of interest exists as to disregard the corporate fiction and treat the corporation and shareholder as alter egos, courts consider a variety of factors, including whether (1) the corporation is operated as a distinct business entity, (2) funds and assets are commingled,

> (3) adequate corporate records are maintained, (4) the nature and form of the entity's ownership and control facilitate misuse by an insider, (5) the business is thinly capitalized, (6) the corporation is used as a "mere shell," (7) shareholders disregard legal formalities, and (8) corporate funds or assets are used for noncorporate purposes.

*Id.* The Tenth Circuit has "f[ou]nd it sufficient to require that a party seeking to pierce the corporate veil show that there was a substantial disregard for the separate corporate entity, and that there is a compelling equitable reason for the court to expose the shareholder to personal liability in the form of fraud, injustice, or evasion of legal obligations flowing from the disregard of the separate corporate entity." *N.L.R.B.*, 2 F.3d at 1054–55.

Here, most of the factors set forth in *Adams* weigh in favor of treating Athena, SJHC, CBD Extracts, YCS, Honeycombs, Young, and Crystal as alter-egos. First, these entities are not "operated as . . . distinct business entit[ies]." *See Adams*, 405 F. Supp. 3d at 943. They are all operated out of the same building; they used some of the same machinery; and the same people did work for them, including the parties in this case. Tr. 155:20–156:19, 365:9–12, 382:21–25, 395:14–18. In addition, it is clear that "funds and assets are commingled" among these individuals and entities, and "corporate funds or assets are used for noncorporate purposes." *See Adams*, 405 F. Supp. 3d at 943. Athena received money on behalf of CBD Extracts and SJHC. Ex. Nos. 6, 13, 14, 23. Young testified that he considers the money in Young Construction Services' and Athena's accounts his "personal money" and that he "transferred funds as needed between Young Construction Services and Athena" and "between Athena and San Juan Hemp Company." Tr. 195:12–14, 196:5–12, 198:5–7; Ex. Nos. 15-1, 15-6, 15-9, 15-15,

15-16, 15-18, 16-19, 16-23, 228.003, 229.055, 229.011, 228.001, 228.003; *see generally* Ex. 15 (Athena bank statements showing numerous meals at restaurants).   Further, "adequate corporate records" were not maintained.   *See Adams*, 405 F. Supp. 3d at 943. For example, on July 15, 2019, Athena's bank account was closed, and the remaining funds were withdrawn, but they remain unaccounted for.   Ex. Nos. 225, 15-36.   While Young testified that the funds were deposited in the SJHC's account, there is no record of such a deposit in SJHC's bank records.   Tr. 198:8–203:9; Ex. 228.   Given all this, it could be said that "the nature and form of the entity's ownership and control facilitate misuse by an insider" and the owners of these business entities "disregard legal formalities."   *See Adams*, 405 F. Supp. 3d at 943.

Moreover, here, "there was a substantial disregard for the separate corporate entity," and the Court finds that there is "a compelling equitable reason for the court to expose the shareholder to personal liability" for the "injustice" inherent in the unjust enrichment claim for which the Court has found in favor of HALO.   *See N.L.R.B.*, 2 F.3d at 1054–55.   In particular, as discussed above, the oil that HALO shipped to Athena and that the Athena parties have kept was "melted" by Crystal, and a sample was sent to a client of her company, Honeycomb.   For these reasons, the Court finds that it is appropriate to treat Athena, SJHC, CBD Extracts, YCS, Honeycombs, Young, and Crystal as alter-egos.

### 2.  Attorney Fees

Defendants and Counterclaim/Third-Party Plaintiff have claimed that they are entitled to attorney fees.   However, pursuant to this District's Local Civil Rule 54.3, "a

motion for attorney fees shall be supported by affidavit," and it "shall include . . . (1) a summary of relevant qualifications and experience; and (2) a detailed description of the services rendered, the amount of time spent, the hourly rate charged, and the total amount claimed."   D.C.COLO.LCivR 54.3(a)–(b).   Defendants/Counterclaim and Third-Party Plaintiffs have provided none of these materials.   Further, this Court's Civil Practice Standards provide that "[a]ll requests for the Court to take distinct actions must be contained in separate, written motions."   Civ. Practice Standard 7.1A(a)(4).   A separate motion has not been filed.   Finally, Federal Rule of Civil Procedure 54 provides that a motion for attorney fees must "specify the judgment and the statute, rule, or other grounds entitling the movant to the award."   Fed. R. Civ. P. 54(d)(2)(B)(ii).   Therefore, in the absence of a separate motion that complies with these rules, the Court DECLINES to consider a request for attorney fees at this time.

## III.   HALO'S MOTION TO AMEND THE PLEADINGS AND THE PRETRIAL ORDER

HALO requests that "the Court allow it to amend the Pretrial Order to conform to the evidence elicited at trial and to add counterclaims of Conversion and Civil Theft" pursuant to Federal Rule of Civil Procedure 15(b).   ECF No. 198 at 1–2.   According to HALO, "the evidence elicited at trial has shown that the Young Parties committed conversion and civil theft against HALO in regard to the oil owned by HALO in the possession of the Young Parties."   *Id.* at 5.

Rule 15(b) provides that pleadings can be amended during and after trial if, "[t]he opposing party had a fair opportunity to defend and whether it could offer additional evidence if the case were retried on the different theory."   *Ellis v. Arkansas Louisiana Gas*

*Co.*, 609 F.2d 436, 439 (10th Cir. 1979) (citing *DeHaas v. Empire Petrol. Co.*, 435 F.2d 1223, 1229 (10th Cir. 1980)).   Whether to grant leave to amend under Rule 15(b) is "in the discretion of the trial court."   *Hardin v. Manitowoc-Forsythe Corp.*, 691 F.2d 449, 457 (10th Cir. 1982).

HALO concedes that "Rule 15(b)(1) does not apply" because the Athena Parties "did not object" at trial.   *Id.* at 11–12.   Therefore, the question is whether the proposed counterclaims of conversion and civil theft were "tried by consent." Rule 15(b)(2). ECF No. 189 at 6; *see also id.* at 8 (arguing that "there can be very little doubt that these claims were tried explicitly or implicitly"); *id.* at 9 (arguing that "[t]he Young Parties, by failing to object when HALO elicited that evidence, implicitly consented to trying HALO's counterclaimsThe Athena Parties argue that they "could not have impliedly consented because the evidence that was introduced was relevant to other claims in the case."  ECF No. 202 at 2–3.

"Implied consent cannot be based upon the introduction of evidence that is relevant to an issue already in the case when there is no indication that the party presenting the evidence intended to raise a new issue."  *Moncrief v. Williston Basin Interstate Pipeline Co.*, 174 F.3d 1150, 1162–63 (10th Cir. 1999) (concluding that the district court abused its discretion by holding that a claim was tried by implied consent).   "When evidence claimed to show trial of an issue by consent pursuant to Rule 15(b) is relevant to a separate issue already in the case, it would be unjust to the opposing party to consider a new theory of recovery after trial is complete.'"  *Id.* (quoting *Cook v. City of Price, Carbon*

*Cnty., Utah*, 566 F.2d 699, 702 (10th Cir. 1977)); *Hardin v. Manitowoc-Forsythe Corp.*, 691 F.2d 449, 457 (10th Cir. 1982).

While HALO argues that "there can be very little doubt that there was evidence submitted that the Young Parties knowingly obtained control of HALO's property by use of deception with the intent to permanently deprive HALO of that property," ECF No. 198 at 8; *see also id.* at 7–8 (describing more specifically the testimony elicited at trial) the Court finds the evidence described as relevant was presented at trial in response to Halo's unjust enrichment counterclaim. This does not establish the requisite consent.

HALO has pointed to no evidence supporting the proposed counterclaims that does not also pertain to the unjust enrichment counterclaim, other than evidence of whether the Athena Parties had "inten[t] to permanently deprive HALO of its oil."  *See* ECF No. 203 at 8–9.  HALO concedes that only civil theft—not conversion—requires the element of intent.  *See* ECF No. 198 at 6–7 (citing *Itin v. Ungar*, 17 P.3d 129, 136 n.10 (Colo. 2000)) ("The difference between a claim for conversion and claim for civil theft is that a claim for civil theft requires evidence of intent, whereas conversion does not."); *see also Huffman v. Westmoreland Co.*, 205 P.3d 501, 509 (Colo. App. 2009) (listing as an element of civil theft that "defendant did so with the specific intent to permanently deprive [plaintiff] of the benefit of the property").  Therefore, HALO has failed to establish that the Athena Parties "impliedly consented" to the trial of the conversion claim.

The Court also finds that amendment of the pleadings to include the civil theft claim would not "conform . . . to the evidence" here because the evidence does not support a

civil theft claim.  *See* Fed. R. Civ. P. 15(b).[6]  "To succeed on [a] civil theft claim, [a claimant] had to establish that (1) defendant knowingly obtained control over his property without authorization and (2) defendant did so with the specific intent to permanently deprive him of the benefit of that property."  *Huffman*, 205 P.3d at 509.

Vindici shipped the oil to Athena thus, Athena originally obtained control over the property with authorization.  Ex. 56-8.  In fact, Vindici emailed Crystal and Young on July 25, 2019 asking them to "please pick up the [oil]" from the UPS store and "run a quick lab test" in "preparation for processing."  Ex. 56-8.  HALO argues, instead, that "where initial control of the property is authorized, the intent to deprive . . . may arise at a later time when control is no longer authorized."  ECF No. 203 at 13–14 (quoting *Electrology Lab'y, Inc. v. Kunze*, 169 F. Supp. 3d 1119, 1161 (D. Colo. 2016)).  Therefore, according to HALO, "even if the Young Parties were initially authorized to possess the product at issue, that authorization ended when it became clear that the Parties did not have an agreement to process the oil."  *Id.*

However, as Plaintiffs point out, on August 1, 2019, Vindici responded to an email from Young about the oil and stated, "[t]he inventory you require is there and you own it. You certainly did have me order it for processing which has been constantly screwed up." Ex. 57-1.  Although HALO argues that it was not required to show that it demanded the return of the oil in order to prove a claim of civil theft, *see* ECF No. 203 at 5–7, in a

---

[6] HALO argues that "it is improper for the Young Parties to argue the merits in response to a motion to amend; the proper result should be that the Court grants the Motion and then allows the parties to submit proposed findings of fact and conclusions of law related to the proposed counterclaims."  ECF No. 203 at 12.  However, HALO has submitted proposed findings of fact and conclusions of law on this issue, which the Court has reviewed and considered.  *See* ECF No. 201 at 67–70.  Nonetheless, the Court still finds that amendment is not warranted here.

situation like this—where the initial possession of the oil was authorized and later HALO stated, "you own it"—a later demand for the return of the oil would be necessary in order to show at what point Plaintiffs' "control [of the oil] [wa]s no longer authorized."  *See Kunze*, 169 F. Supp. 3d at 1161; *see also Easy Street Corp. v. Parmigiani Fleurier SA*, No. 04-cv-02424-MEH-BNB, 2007 WL 2288187, at *8 (finding that the defendant was "not liable for civil theft" where the "[p]laintiff did not request the return of the [allegedly stolen items] after it refused the return of [them]").  Moreover, although the Court has already found that Plaintiffs did not "impliedly consent" to the trial of a conversion claim, the Court also notes that such a claim certainly requires that the claimant "demand for the return of the property."  *See Easy Street*, 2007 WL 2288187, at *7 (quoting *University of Colo. Found., Inc. v. American Cyanamid Co.*, 880 F. Supp. 1387, 1392 (D. Colo. 1995)) ("[P]redicates to a successful claim for conversion are the owner's demand for the return of the property and the controlling party's refusal to return it.").  HALO has pointed to no evidence that it, through Vindici, ever demanded the return of the oil.

For these reasons, the Court finds that although, for the reasons stated above, the Athena Parties appear to have unjustly received a benefit from HALO, in the form of the oil, the more specific elements for a claim of civil theft pertaining to the Athena Parties' retention of the oil would not would "conform to the evidence."  *See* Fed. R. Civ. P. 15(b)(2).  Accordingly, HALO's request to amend the pleadings and the Pretrial Order to add counterclaims of conversion and unjust enrichment is DENIED.

## IV.   CONCLUSION

For the reasons stated above, it is

**ORDERED** that Plaintiffs' claims for relief are **DENIED**, and judgment shall enter in favor of Defendants and against Plaintiffs on Plaintiffs' claims for negligent misrepresentation, fraudulent concealment, and declaratory judgment; it is

**FURTHER ORDERED** that Counterclaim/Third-Party Plaintiff HALO Laboratories, LLC's counterclaims/third-party claims for relief for fraud, negligent misrepresentation, and promissory estoppel are **DENIED**, and judgment shall enter in favor of Counterclaim and Third-Party Defendants and against Counterclaim/Third-Party Plaintiff HALO on these counterclaims/third-party claims; it is

**FURTHER ORDERED** that Counterclaim/Third-Party Plaintiff HALO's counterclaim/third-party claim for relief for unjust enrichment is **GRANTED**, and judgment shall enter in favor of Counterclaim/Third Party Plaintiff HALO and against Counterclaim and Third-Party Defendants on this claim, in the amount of $93,220.34, plus prejudgment interest, accruing from July 25, 2019;

**FURTHER ORDERED** that, consistent with this Order, Plaintiffs' and Third-Party Defendants' oral Motion for Judgment on Partial Findings under Rule 52(c) is **DENIED**; it is

**FURTHER ORDERED** that, consistent with this Order, Defendants'/Counterclaimants and Counterclaim and Third-Party Plaintiffs' oral Motion for Judgment on Partial Findings under Rule 52(c) is **GRANTED IN PART** and **DENIED IN PART**; it is

**FURTHER ORDERED** that HALO Laboratories' Motion Under F.R.C.P. 15(b) to Amend the Pleadings and the Pretrial Order, ECF No. 198, is **GRANTED IN PART** and **DENIED IN PART**; and it is

**FURTHER ORDERED** that the parties shall confer and file a proposed order of judgment within seven (7) days of the date of this order.

DATED:  March 25, 2024

BY THE COURT:

_____
REGINA M. RODRIGUEZ
United States District Judge